## Myers *versus* Black.

1. Where the evidence of part execution of a parol contract for the sale of land is not sufficient, the court should so instruct the jury.

2. The Act of 24th February, 1834, relating to executors and administrators, invested the Orphans' Court with full authority to make and enforce a decree of specific performance of a parol contract for the sale of land, made by a vendor, who afterwards died; and the Act of 21st March, 1806, providing, that where a remedy is enjoined by an Act of Assembly, the directions of the act shall be strictly pursued, it was *held*, that the exclusive remedy of the *vendee* in such a case is in the.Orphans' Court, and that an ejectment cannot be sustained.

ERROR from the Common Pleas of *Montgomery county.*

This was an ejectment by Charlotte Black against the executors of *Jacob* Myers, deceased, to recover a piece of land fifty feet in width, adjoining the land of the plaintiff. And the title set up was a parol agreement, by the testator, to permit her to occupy it, during his life, at $3 per annum, and to have a conveyance of it at his death, on payment of $50.

On the 18th June, 1846, one *Reuben* Myers entered into articles with C. Black, to sell her a piece of land for $1000, under a forfeit of $100, by either party refusing to comply. This land adjoined the lot now in question, and was conveyed to her pursuant to the contract, by deed dated April 1, 1847.

The agreement, on which this suit is founded, was stated by a witness to be thus:—In January, 1847, *Reuben* Myers called on C. Black to make a payment on the articles. She said she would rather pay the forfeit than take the land, without additional ground adjoining. That Reuben acquiesced in the propriety of her wishes, and promised to see his father, Jacob Myers (the testator). On the next evening, *Jacob* Myers agreed to let her have "about fifty feet" adjoining, on the terms that she should pay $3 per annum, during his life, and $50 as the price of it at his death, when *Reuben* would make her a deed.

It was conceded that no *written agreement* was executed; and whether the case was taken out of the statute was the main question. The truth of this alleged contract was, however, denied.

At the time of the contract between Reuben and the plaintiff, his property was occupied by his tenant, Josiah Heartley. It was separated from the land in dispute by a fence. In this fence was a gate, which opened on to the disputed ground, which was part of a meadow. The meadow was pastured by the occupants of the testator's farm. While Heartley occupied Reuben's property, he used to go through this gate and dry his clothes in the meadow, and get water from the mill-race on the side of the meadow. He had also, by the consent of Reuben (not the testator), put a pig-

pen and chicken-coop there, and a small erection a few feet from
the fence.

But it was alleged that his occupancy was wholly indefinite, and
by no defined lines or boundaries.   After plaintiff purchased from
Reuben, Heartley continued to occupy the property as her tenant;
but when he attorned did not appear.   Nor was there any evi-
dence that he attorned for the land in dispute; and it was disputed
whether he paid rent for it, or was directed to do so by the owner;
it had been used by him, in the manner spoken of, by permission
of Reuben Myers.   He also continued to use the meadow as for-
merly.   In July, 1847, Heartley quitted possession of the adjoining
house and lot, and McMullin entered as plaintiff's tenant, and used
the meadow as it had been used by Reuben Myers's tenants.   His
testimony, on this point, was, "I *suppose* I rented the whole pro-
perty."   He was the only witness to prove the parol agreement.
Whether he had a lease of the premises in question was disputed.
Two or three months after his entry, the defendant's testator
chained up the gate; McMullin opened it, and again used the land,
and was again excluded by Jacob Myers, who had a wall erected
without a gate in it.   *Jacob Myers died in January*, 1849.   Within
three months after his death, the plaintiff tendered $50 to the
executors, but it was rejected, and no conveyance was made.   A
large lot, including the property in dispute, was devised by Jacob
Myers to Reuben Myers, at a valuation.   Reuben did not take it,
and the land was sold at public auction, by the executors, under
the power in the will, and a conveyance was made after this suit
was brought.

A reference was had under an agreement between Jacob Myers
and the plaintiff, which on one side, it was contended, was conclu-
sive: on the other side, it was contended that it was not.

KRAUSE, J., charged, *inter alia*, as follows:—"The plaintiff
claims to recover a patch of ground, which seems to be described in
the writ, on a parol contract.   The first question is, has she proved
such contract as entitles her to a specific execution, if nothing else
in the case prevents her?   For this the jury must look to the
testimony and determine the facts.   It would seem that, in 1846,
she agreed with Reuben Myers for a certain property, in writing,
dated 18th of June of that year, in which she was to pay, on
failure to comply, a certain sum as forfeit-money.   Reuben called
on her for the purchase-money some time in 1847, when she told
him she needed more ground adjoining, to which he assented; and
as his father Jacob Myers had willed that ground to him in an
instrument then executed, though Jacob was still alive, he would
see him about it, and let her know in a day or two.   After that
Jacob said she should have such ground, being this in dispute, and
Reuben should make her a deed for it *after his decease;* she then

[Myers *v.* Black.]

to pay $50 as the price; and, in the mean time, she to have possession and pay $3 per year, as interest. Witness says, that Jacob told her to take possession and use the property as her own by paying the $3 per year, and that Reuben pointed out its extent on the spot or ground; and that soon after she took a deed from Reuben, and built on the property contained in it; and that after this arrangement was made between her, Reuben, and Jacob, the matter of the forfeit was dropped, and she took the property. Then there is evidence that after Jacob's death she tendered to Reuben, as one of his executors, the $50, which was refused, and that afterwards, and after this suit was brought, the executors sold the patch in dispute to another. She has also paid what she says is $50 into court, to be taken by defendants if the verdict should be in her favor. There is also evidence that said arrangement was made in January or February, 1847, and Heartley says he had rented the house of Reuben in 1843, and used the ground in question until 1847, as his tenant, when he rented from plaintiff and used it as before; a few months after which he left, and McMullin moved in, and still continues. McMullin says he rented from her the patch in dispute, it having been occupied by Heartley before, who left it about July 1847; that he used the patch for certain purposes a short time, when Jacob shut the gate; that he afterwards used it again, when he was again shut out; since which he has not used it at all. There is evidence that Jacob built a high wall to keep her or her tenants out; that in 1848, she sent for Altemus, among other things, to cut off her piazza, and make up the fence. He cut off eighteen inches of the corner towards these fifty feet, and set up the fence along stakes pointed out by her and Jacob Myers; that there was no gate put in the fence, and the parties appeared satisfied. This was 24th August of that year. The stone fence has been put up since, and no gate in it. There is also evidence of a submission and award between her and Jacob, one dated 15th December, 1847, and the other 21st February, 1848." He referred to the jury the question whether the contract alleged on the part of plaintiff, was proved, and if so, whether there was such part performance before suit brought as entitled her to a specific execution of it; as to what constituted part performance, reference was made to the case of Pugh *v.* Good, 3 *W. & Ser.* 56; that possession must be taken in pursuance of the contract.

Verdict was rendered for the plaintiff.

The 13th section of the Act of 21st March, 1806, provides, " In all cases where a remedy is provided or duty enjoined, or anything directed to be done by any Act or Acts of Assembly of this Commonwealth, the directions of the said Acts shall be strictly pursued, and no penalty shall be inflicted, or anything done agreeably to the provisions of the common law in such cases, further than shall be necessary for carrying such Act or Acts into effect."

The case was argued by *McMurtrie*, for plaintiff in error.—The action is prohibited by law. It is ejectment on a parol agreement not to be executed by conveyance until the death of the vendor. Such a remedy was once allowed for want of a Court of Chancery; for though the statute of frauds forbade it, yet equity relieved in certain cases. Ejectment is a substitute for a bill in equity on an equitable title, or to enforce performance of a contract *for want of a Court of Chancery*: Peebles v. Reading, 8 *Ser. & R.* 491; S. P. Hawn v. Norris, 4 *Bin.* 77.

A conditional verdict was never allowed to enforce a common law right, but *as an instrument of equity to enforce specific execution of a contract*. And this can only be where the contract is one a chancellor would enforce: Irwine v. Bull, 4 *Watts* 289.

But now a specific remedy for such cases is given, and in it are included all cases of parol, or unexpected contracts of decedents, not void by the statute, for the purpose of giving a title.

By Act of 1834, relating to executors and administrators, sect. 15–18, the remedy for enforcing such contracts as the present (if capable of specific enforcement) is given *to the Orphans' Court*, by bill or petition; and this extends to contracts to be performed at the death of the vendor: Brinker v. Brinker, 7 *Barr* 55.

This remedy has been of gradual growth. By Act, 1792, unperformed written contracts were provided for; by Act, 1818, parol contracts, when so far performed that rescission would be unjust. But the common law remedy was preserved, subject to a penalty. By the Act, 1834, which vests the Orphans' Court with the jurisdiction, no other remedy is preserved: Chess's Appeal, 4 *Barr* 54. The old Acts were found inefficient, the remedy to compel obedience being by the intervention of a jury; therefore, full equity powers were given by the Act, 1834, to the Orphans' Court.

Where specific remedies are thus given by statute, in aid of equitable rights, the common law remedy (theretofore sustained in Pennsylvania) is destroyed.

The words of the *Act*, 1806 (Acts of Assembly), expressly exclude other remedies.

This principle has been ruled to extend to a case precisely analogous, viz., the recovery of *legacies charged on land*. For them, ejectment or debt lay by the common law of Pennsylvania: Galbraith v. Fenton, 3 *Ser. & R.* 361; Long v. Long, 1 *Watts* 267; Bear v. Whittaker, 7 *Watts* 144. The 59th section of the Act of 24th February, 1834, relating to executors and administrators, gave a remedy, by petition, in the Orphans' Court in such cases; not, however, in terms excluding other remedies: but this, *per se*, excluded all other remedies:

1. Because of the Act, 1806. 2. Because the other remedies were supported for want of proper equity powers: Downer v.

Downer, 9 *Watts* 60; Craven *v.* Bleakney, 9 *Watts* 19; Strickler *v.* Sheaffer, 5 *Barr* 240; Reed *v.* Reed, *Id.* 241, n.; Mohler's Appeal, 8 *Barr* 29.

Every argument in these cases applies with equal force to the present point.

An additional reason exists. The common law remedy does but half the work. It does not perfect the title. It, *finally*, concludes no one. It merely transfers the possession. This was one mischief intended to be remedied by the Acts: Hagerty's case, 4 *Watts* 307.

2. But, supposing the Orphans' Court remedy not to be exclusive, there was no such performance of the contract as is required by the statute. There must have been an *exclusive* possession taken; and that, *pursuant to and in consequence of* the parol contract.

*Pancoast* and *Boyd* for defendant.—The first argument on the part of the plaintiffs in error, is that the Act of 1834, giving a specific remedy in the Orphans' Court for the unexecuted contracts of decedents, excludes all other remedies. There is no provision in the Act of 1834 excluding other remedies. This Act of 1834 gives an *additional remedy* in the Orphans' Court, and provides a distinct system from that provided in the Acts of 1792 and 1818: Chess's Appeal, 4 *Barr* 54. The Act of 1818, which the plaintiff confesses preserved the common law remedy—though subject to a penalty, is not repealed by it, nor is the remedy in the Court of Common Pleas therein provided, excluded; for the legislature have since recognised and extended that remedy. The Act of April 9, 1849, s. 2, extends and perfects the remedy provided by Act of 1834 in the Orphans' Court, to cases where the purchaser is one of the executors or administrators, enabling the co-executor or administrator to make the deed, or if he is the only executor or administrator, enabling the sheriff to make the deed. And the Act of April 3, 1851, s. 6, *Pamphlet L.* 307, extends and perfects the remedy provided in the Court of Common Pleas, by Act of 1818, to similar cases. Cited Chess's Appeal, 4 *Barr* 54. See opinion of Rogers, J.

But supposing the Act of 1834 to prohibit all other remedies, this case does not come within the Act. By the provisions of the 15 and 16 sections, those cases only are included in the Act, "Where no sufficient provision for the performance of the contract shall have been made by the decedent." In the Acts of 1792 and 1818, the same exception is found: "The mischief intended to be remedied by these Acts, was, that in case of death there might remain a contract of the deceased, binding on his executor or administrator, but no person in being capable of carrying it into specific execution." Rogers, J., 4 *Barr* 54. In the cases provided for by the

R 2

[*Myers v. Black.*]

Acts, the purchaser had no means of having his contract performed. In this case the testator had made a sufficient provision for the performance of his contract. A power of sale either by public or private sale was given to the executors by testator in his will. The executors under this could perform the contract of testator. While this was a sufficient provision for the performance of all unexecuted contracts of testator, the evidence shows that it was given for the particular performance of the contract in this case.

It was alleged to have been proved that the possession taken was exclusive and continued; that it was taken by direction of the testator, and of the ground as marked off and shown to the tenant.

The opinion of the court was delivered by

BLACK, C. J.—It is not necessary to discuss the facts of this case at length, nor to refer at all to the numerous authorities by which the law on the subject of parol sales has been settled. Suffice it to say that the evidence of part execution is in our opinion not sufficient to take the contract out of the statute of frauds; and the judge who tried the cause ought to have said so to the jury.

But there is another question in the cause, which, being comparatively a new one, demands more particular attention.

The contract of sale is alleged to have been made by Jacob Myers in his lifetime. He died without executing it, or making any sufficient provision for its execution; and this ejectment to enforce performance of it is brought against his executors. The counsel of the defendant below insisted that the Court of Common Pleas had no jurisdiction.

The want of a Court of Chancery made it necessary to administer equity under the forms of legal actions. Therefore if a contract for a sale of land was unexecuted, an ejectment was substituted for a bill in equity, and a court of law, with a jury, was put in the place of a chancellor. But the Act of 1834, sects. 15 and 16, invested the Orphans' Court with full authority to make and enforce a decree of specific performance in every case where the vendor is dead. This statute, providing an ample remedy before a tribunal with equity powers, took away the only reason that ever existed for the previous mode of proceeding in the class of cases to which it refers. Since that time, an ejectment is no longer necessary to serve the purpose for which it was formerly allowed to be used. *Cessante ratione legis, cessat et ipsa lex.*

Besides, a statute passed in 1806, declares that when a remedy is given by any Act of Assembly, such Act shall be strictly pursued, and the common law remedy shall no longer be resorted to. Now

[Myers *v.* Black.]

we have a remedy given by the act of 1834, in all cases of unexe-
cuted contracts for the sale of lands by decedents.   It follows that
if specific performance of such a contract is sought to be enforced
anywhere except in the Orphans' Court, it must be done in flat
disobedience to the statute of 1806.

For reasons similar to those which I have thus briefly given, it
has been repeatedly held that a legacy charged on land could only
be recovered in the Orphans' Court: Craven *v.* Bleakney, 9 *Watts*
19; Downer *v.* Downer, 9 *Watts* 60; Strickler *v.* Shaffer, 5 *Barr*
240; Mohler's Appeal, 8 *Barr* 39.   This court has also decided
in Simpson *v.* Thomas, 3 *Barr* 60, that a widow whose interest in
the estate of which her husband died seised and possessed, is
withheld from her, must look to the Orphans' Court alone for
redress; the action of dower being impliedly taken away by the
statute which gave her another remedy.   The principle on which
these cases base themselves cannot be distinguished from that
which lies at the foundation of the present one.

I will add, by way of recapitulation and conclusion, that a rule
of law so universally received, that it passes everywhere for a
maxim; an Act of the legislature which we dare not set at nought;
and numerous adjudications commanding our highest respect upon
precisely analogous subjects, compel us to declare that since the
Act of 1834, an ejectment in a case like this cannot be sustained.

Judgment reversed and *venire de novo* awarded.